**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| Cardinal Square, LLC,<br><br>Plaintiff,<br><br>v.<br><br>QBE Specialty Insurance Company,<br><br>Defendant. | Case No. 1:23-cv-00114-JRS-MJD |

**PLAINTIFF CARDINAL SQUARE, LLC'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jason R. Delk (#24853-18)
DELK MCNALLY, LLP
211 S. Walnut Street
Muncie, Indiana 47305
delk@delkmcnally.com

Sean W. Shirley (admitted *pro hac vice*)
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, Alabama 35203
sshirley@balch.com

# TABLE OF CONTENTS

SUMMARY ..... 1

INTRODUCTION ..... 2

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ..... 3

SUMMARY JUDGMENT STANDARD ..... 21

INDIANA LAW ..... 21

I. The Parties' Respective Burdens of Proof. ..... 21

II. Insurance Policy Rules of Interpretation and Construction. ..... 22

ARGUMENT ..... 22

I. Lightning is a Covered Loss under the Policy and the HVAC systems are Covered Property. ..... 22

II. There is no Genuine Dispute of Material Fact that the October 20, 2020 lightning Loss Caused Direct Physical Damage to the HVAC systems at Village Promenade. ..... 23

A. "Loss" under Indiana law means Physical Alteration to Covered Property, which includes HVAC systems. ..... 24

III. There Is No Genuine Dispute of Material Fact that Cardinal Square Did Not Conceal or Misrepresent its Lawsuit against LG, either when It Procured the QBE Policy or when It Filed its Lightning Claim. ..... 28

A. Cardinal Square's Immaterial Delay in Informing QBE about the LG Lawsuit was Neither False nor Willful. ..... 30

B. Even if there is a Genuine Dispute of Fact as to Whether Cardinal Square Willfully and Falsely Omitted the LG suit from its Insurance Application, the Omission was not Material. ..... 32

CONCLUSION ..... 35

CERTIFICATE OF SERVICE ..... 37

# TABLE OF AUTHORITIES

**Cases**

*Acuity v. Auto Tech Automotive Inc.*,
No. 2:09–CV–336, 2012 WL 124928 (N.D. Ind. Jan. 17, 2012) ........ 37, 38

*Advance Cable Co., LLC v. Cincinnati Ins. Co.*,
788 F.3d 743 (7th Cir. 2015) ........ 29

*Am. Econ. Ins. Co. v. Liggett*,
426 N.E.2d 136 (Ind. Ct. App. 1981) ........ 34

*Am. States Ins. Co. v. Kiger*,
662 N.E.2d 945 (Ind. 1996) ........ 35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 25

*Awbrey v. United States*,
959 F. Supp. 1019 (S.D. Ind. 1997) ........ 26

Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,
40 F.3d 146 (7th Cir. 1994) ........ 25

*Circle Block Partners, LLC v. Fireman's Fund Ins.* Co.,
44 F.4th 1014 (7th Cir. 2022) ........ 28, 29

*Colonial Penn Ins. Co. v. Guzorek*,
690 N.E.2d 664 (Ind. 1997) ........ 36

*Curtsinger v. State Farm Mut. Auto. Ins. Co.*,
120 F. Supp. 3d 857 (S.D. Ind. 2015) ........ 25

*Eli Lilly and Co. v. Home Ins. Co.*,
482 N.E.2d 467 (Ind. 1985) ........ 26

*Gasperini v. Ctr. for Humanities, Inc.*,
518 U.S. 415 (1996) ........ 25

*Hartford Cas. Ins. Co. v. Evansville Vanderburgh Pub. Libr.,*
860 N.E.2d 636 (Ind. Ct. App. 2007) ........ 26

*Homeowners Choice Prop. & Cas. v. Miguel Maspons*,
211 So. 3d 1067 (Fla. Dist. Ct. App. 2017) ........ 30

*Indiana Repertory Theatre v. Cincinnati Cas. Co.*,
180 N.E.3d 403 (Ind. Ct. App.), *transfer denied sub nom.*, 193 N.E.3d 372 (Ind. 2022) ........ 28

*Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am*.,
849 F.3d 355 (7th Cir. 2017) ........ 25

*InsureMax Insurance Company v. Bice*,
879 N.E.2d 1187 (Ind. Ct. App. 2008) ........ 36, 38

*Jackson v. Kotter*,
541 F.3d 688 (7th Cir. 2008) ........ 25

*Morris v. Econ. Fire & Cas. Co.*,
848 N.E.2d 663 (Ind. 2006) ........ 26

*Oral Surgeons, P.C. v. Cincinnati Ins. Co.*,
2 F.4th 1141 (8th Cir. 2021) ........ 28
*Passmore v. Nauman*,
No. 220CV00584JPHMJD, 2023 WL 5980038 (S.D. Ind. Sept. 14, 2023) ........ 11
*Ryerson v. Federal Ins. Co.*,
676 F.3d 610 (7th Cir. 2012) ........ 25
*Selective Ins. Co. of Am. v. Smiley Body Shop, Inc.*,
260 F. Supp. 3d 1023 (S.D. Ind. 2017) ........ 34
*T.R. Bulger, Inc. v. Indiana Ins. Co.*,
901 N.E.2d 1110 (Ind. Ct. App. 2009) ........ 29
*Tate v. Secura Ins.*,
587 N.E.2d 665 (Ind. 1992) ........ 26
*Tenore v. American & Foreign Ins. Co. of New York*,
256 F.2d 791 (7th Cir.1958) ........ 34
*Trzcinski v. Am. Cas. Co.*,
953 F.2d 307 (7th Cir. 1992) ........ 34
*United States v. Daniels*,
566 F. Supp. 3d 191 (E.D.N.Y. 2021) ........ 11

**Rules**

Fed. R. Civ. P. 30 ........ 10
Fed. R. Civ. P. 56 ........ 25
Fed. R. Evid. 201 ........ 11

**Other Authorities**

10A Couch on Ins., Nature & Scope of Coverage, § 148:50 ........ 27
17A Couch on Ins. ........ 31
69 A.L.R.4th 359 § 19 ........ 9
Machine, MERRIAM-WEBSTER DICTIONARY ONLINE (available at https://www.merriam-webster.com/dictionary/machine) (last accessed Dec. 21, 2023) ........ 9
Machinery, MERRIAM-WEBSTER DICTIONARY ONLINE (available at https://www.merriam-webster.com/dictionary/machinery) (last accessed Dec. 21, 2023) ........ 9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| Cardinal Square, LLC,<br><br>Plaintiff,<br><br>v.<br><br>QBE Specialty Insurance Company,<br><br>Defendant. | Case No. 1:23-cv-00114-JRS-MJD |

**PLAINTIFF CARDINAL SQUARE, LLC'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, Cardinal Square, LLC ("Cardinal Square"), submits the following Brief in Support of its Motion for Partial Summary Judgment.

**SUMMARY**

1. There is no genuine dispute of material fact that lightning is a covered cause of loss and HVAC systems are covered property under the terms of the QBE insurance policy ("the Policy" or "the QBE Policy").

2. There is no genuine dispute of material fact that the HVAC systems at Village Promenade were physically damaged by lightning, thereby triggering QBE's coverage obligations under the Policy.

3. There is no genuine dispute of material fact that Cardinal Square did not fraudulently conceal its lawsuit against LG, the manufacturer of the HVAC systems, when it procured the Policy or when it submitted its lightning loss claim.

Accordingly, Cardinal Square requests the Court enter partial summary judgment that coverage applies to lightning loss to the HVAC systems at Village Promenade and is not excluded by the Policy's fraud condition, and that lightning damage triggers coverage under the Policy.[1]

## INTRODUCTION

Cardinal Square purchased a commercial lines insurance policy ("the Policy") from Defendant, QBE Specialty Insurance Company ("QBE"). The Policy covers "direct physical loss of or damage to Covered Property" resulting from any "Covered Cause of Loss." The Policy defines "Covered Causes of Loss" by reference to the "Cause of Loss" form in the Policy's Declarations which, in turn, broadly defines the term to mean "direct physical loss unless the loss is excluded or limited." Under the plain meaning of the Policy terms, lightning is a covered peril, HVAC systems are Covered Property, and a loss occurs when Covered Property is physically damaged by a covered peril. There is no genuine dispute of material fact that lightning struck Village Promenade and that the HVAC systems, "Covered Property," were physically damaged by lightning ("the lightning loss").

In May 2018, before the lightning loss, Cardinal Square filed suit against the HVAC systems' manufacturer, LG Electronics ("LG"), after the HVAC systems failed to perform as warranted ("the LG suit"). The HVAC component failures were ultimately linked to formicary corrosion at a rate unacceptable for a new system with a 20+ year service life. But post-lightning loss investigations by LG and an expert engineering firm not only confirmed physical damage in the form of scorched circuit boards, failed compressors, damaged electronics of all kinds, and blown fuses from the lightning strikes; but they also attributed the changing nature, severity, and

[1] To be clear, Cardinal Square does not seek summary judgment on the *extent* of the damage and concedes there is a genuine dispute as to the extent of damage attributable to lightning and that the cost of repair and replacement should be determined at trial.

exponential increase in very different post-lightning HVAC component failures to the lightning strikes. Other non-HVAC electrical systems, such as the closed-circuit television cameras, internet, the parking garage gate, electricity metering system, and automated door locks were also damaged by the lightning strikes.

QBE alleges in its 35th and 36th affirmative defenses and in paragraphs 62 through 65 of its counterclaim that Cardinal Square violated the Policy's "Concealment, Misrepresentation or Fraud" condition ("the Fraud condition") by waiting until three (3) months after the lightning loss (but still more than one year prior to QBE's coverage determination) to disclose the LG suit. There is no genuine dispute of material fact that the timing of Cardinal Square's disclosure was not material because it did not affect QBE's handling of the claim. Accordingly, the Fraud condition is inapplicable.

QBE also alleges in its affirmative defenses and counterclaim that Cardinal Square violated the Fraud condition by failing to disclose the LG suit in its application to QBE for insurance. But QBE did not ask about prior suits *by* Cardinal Square in the insurance application and, either way, the Fraud condition does not apply to purported fraud in the procurement of the policy. Even if it did, there is no genuine dispute of material fact that the failure to disclose the LG suit in its insurance application was not material to QBE's decision to insure Cardinal Square.

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

As required by S.D. Ind. Local Rule 56.1., Cardinal Square submits the following statement of material facts ("SMF") as to which it believes there is no genuine dispute and warrants partial summary judgment in its favor.

**The Parties.**

1. Cardinal Square, LLC is a single-purpose entity which was formed to develop

and own Village Promenade, which is a 522-bed student housing property with approximately 19,000 square feet of commercial space in Muncie, Indiana. (See Ex. A, Larry Gough Dep. Tr. Vol. I, at 8:7-17, 14:14-15:1).[2]

2. QBE is an international general insurance and reinsurance company that offers commercial, personal, and specialty policies, including the all risks commercial policy purchased by Cardinal Square for Village Promenade. QBE, "About QBE," https://www.qbe.com/about-qbe (last visited Jan. 4, 2024).

**The QBE Policy.**

3. Cardinal Square purchased the Policy for $106,668.00 to cover the period spanning August 1, 2020 to August 1, 2021. (Ex. B, QBE Policy, at 3.)[3]

4. The Policy covered Village Promenade, which is located at 1623 W. University Avenue in Muncie, Indiana. (*Id.* at 7.)

5. The Policy provides replacement cost benefits. (*Id.* at 38 (Valuation indicated as "RC" for "Replacement Coverage").)

6. The "Building and Personal Property Coverage Form" states that QBE "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." (*Id.* at 68.)

7. Similarly, the Business Income (and Extra Expense) Coverage Form specifies that applicable causes of loss are "shown in the Declarations." (*Id.* at 84.)

---

[2] The Deposition of Larry Gough and select exhibits thereto are attached as Exhibit A.

[3] A true and correct copy of the QBE Policy is attached as Exhibit B.

8. The "Causes of Loss – Special Form," governing covered causes of loss, states, "[w]hen Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy." (*Id.* at 103.)

9. The Declarations page incorporates by reference a "Schedule of Forms and Endorsements" as "[f]orms and endorsements made a part of this policy at the time of issue." (*Id.* at 3.) That schedule includes the above-referenced "Special Form." (*Id.* at 5-6.)

10. In addition, the plain language of the Building and Personal Property Coverage Form extends coverage to the HVAC Systems installed at Village Promenade. The Policy states that "[p]ermanently installed . . . 'Machinery [and] Equipment'" is "Covered Property." (*Id.* at 68.)

11. In addition to being a fixture by virtue of being integrated into the buildings comprising Village Promenade, the HVAC systems fall under the plain meaning definitions of "machinery" and "equipment."[4]

12. The Policy includes the following "Indiana Changes" to the Fraud condition: "[QBE] will not pay for any loss or damage in any case of: 1. Concealment or misrepresentation of a material fact or 2. Fraud committed by an insured at any time and relating to a claim under

---

[4] See, e.g., 69 A.L.R.4th 359 § 19 (Originally published in 1989) (Air conditioner units permanently installed in building that cannot be used without force have been held to be fixtures); Equipment, MERRIAM-WEBSTER DICTIONARY ONLINE (available at https://www.merriam-webster.com/dictionary/equipment) (last accessed Dec. 21, 2023) ("all the fixed assets other than land and buildings of a business enterprise"); Machine, MERRIAM-WEBSTER DICTIONARY ONLINE (available at https://www.merriam-webster.com/dictionary/machinery) (last accessed Dec. 21, 2023) ("machines in general or as a functioning unit"); Machinery, MERRIAM-WEBSTER DICTIONARY ONLINE (available at https://www.merriam-webster.com/dictionary/machine) (last accessed Dec. 21, 2023) ("a mechanically, electrically, or electronically operated device for performing a task"). HVAC equipment is mechanically and electrically operated to perform the task of heating and cooling interior air.

this policy." (*Id.* at 27.) QBE conceded this fact at deposition. (Ex. C, Fed. R. Civ. P. 30(b)(6) representative Shannon Grunst Dep. Tr. at 166:19-167:24.)[5]

**Lightning Strikes Village Promenade on October 20, 2020.**

13. On October 20, 2020, lightning struck Village Promenade not once, but twice—and the strikes were no more than a second apart, both direct hits. (Ex. D, Rick Rambacher Decl., ¶¶4-5, Ex-1 at 37-40.)[6]

14. For the night of October 20, 2020, a CoreLogic STRIKEnet® Report for the coordinates within 1 mile of Village Promenade indicated "7 cloud-to-ground lightning strikes detected within 1 mile of the property." (Ex. D, Rick Rambacher Decl. ¶¶4-5, Ex-1 at 37-40)

15. Two of the strikes were direct -they struck within 0.0 miles of Village Promenade's exact coordinates and within one second of one another at 10:36:04 P.M. local time, and did so with peak currents of 42,600 and 94,200 amperes. (*Id.* at 40.)

16. QBE's first expert Paul Castellano with the firm of Madsen, Kneppers & Associates ("MKA") confirmed that his own STRIKEnet® Report "shows that there were 583 cloud-to-ground strokes detected within 10 miles of the property on the date of loss including <u>two strokes that were at the property (measured a distance of 0.0 miles).</u>" (Ex. E, February 10, 2021 Email from Paul Castellano to Adam Jacobs at Bates QBE_000684, marked as Ex. 12 to deposition of Adam Jacobs) (emphasis in original).[7] Jacobs verified receipt of the email and STRIKEnet® Report at deposition. (Ex. H, Adam Jacobs Dep. Tr. at 129:24-131:11.)[8]

---

[5] The Deposition of Fed. R. Civ. P. 30(b)(6) corporate representative Shannon Grunst is attached as Exhibit C.

[6] The Declaration of Rick Rambacher and exhibits thereto are attached as Exhibit D.

[7] A true and correct copy of this email chain and STRIKEnet® report is attached as Exhibit E.

[8] The Deposition of QBE Claim Adjustor Adam Jacobs is attached as Exhibit H.

17. For scale, a typical lightning flash is about 300 million volts and about 30,000 amperes.[9] The smaller strike that struck Village Promenade was more than 50% more powerful than an average strike, and the other was 300% more powerful. Together, the two direct strikes subjected Village Promenade buildings and their electrical systems to voltage equivalent to four-and-a-half times the power of a single average lightning strike.[10]

18. QBE's second expert, Engineering Systems, Inc. ("ESi"), admitted that "[w]eather records confirm that lightning strikes occurred ***at or near the loss location*** at about 10:30 pm on 20 October 2020." (Ex. F, ESi Report, at 2.)[11] (emphasis added). Similarly, ESi confirmed the proximity of the "two lightning strikes" as being "centered on Village Promenade buildings." (*Id.* at 5.)

19. Immediately after the strikes, 35 out of 36 of Village Promenade's HVAC systems completely shut down. (Ex. D, Richard Rambacher Decl., Ex. 1, at 4-5). So too did the security system, fire protection system, electrical usage monitoring system, communication system, magnetic security doors, the parking garage gate, and various televisions. (*Id.* at 11-12.)

20. As of February 22, 2021, Cardinal Square had already incurred $18,530.54 for the replacement of internet and networking equipment, $66,459.89 for the replacement of a fire alarm system, and $716,617.90 for damage to the closed circuit television system. QBE's first expert,

---

[9] NATIONAL WEATHER SERVICE, "How Powerful is Lightning?" https://www.weather.gov/safety/lightning-power (last visited December 28, 2023).

[10] Cardinal Square requests the Court take judicial notice of the average amperage of a lightning stroke as indicated by the National Weather Service. The Federal Rules of Civil Procedure allow the Court to take judicial notice of weather conditions. Fed. R. Evid. 201(b); *see also Passmore v. Nauman*, No. 220CV00584JPHMJD, 2023 WL 5980038, at FN1 (S.D. Ind. Sept. 14, 2023) (taking judicial notice of weather facts by referencing www.weatherunderground.com); *United States v. Daniels*, 566 F. Supp. 3d 191, 197 (E.D.N.Y. 2021) (Court could take judicial notice of National Weather Service data because it be could "be 'accurately and readily determined' from reliable sources.").

[11] A true and correct copy of the ESI report is attached as Exhibit F.

Paul Castellano, approved the payment of these incurred costs and found that the damage was consistent with "an event such a lightning or power surge for a building of this type and size." (Ex. G, February 26, 2021 Email Chain from Steve Dodge to Paul Castellano and Adam Jacobs; Bates QBE _32, marked as Ex. 16 to the deposition of Adam Jacobs).[12] Jacobs verified receipt of the email at deposition. (Ex. H, Adam Jacobs Dep. Tr. at 101:13-105:8.)

21. In response to the lightning strikes, Village Promenade's maintenance supervisor, Kevin Pritchett, prepared an Incident Report.[13] (Ex. I, Pritchett Incident Report.) Pritchett reported that he received a call from residents indicating that smoke alarms had gone off "after the power flashed." (*Id.* at 3.) By the time Pritchett arrived at Village Promenade, he had received "multiple calls" indicting "some resident[s] had no thermostats[,] some had partial power to rooms[.] (*Id.*) Pritchett also wrote, "[a]fter walking the hallways I noticed all common area thermostats were showing errors. (*Id.*)[14]

**The post-lightning investigations and the changing nature and frequency of HVAC problems at Village Promenade.**

22. QBE initially covered Cardinal Square's claim for lightning damage to the HVAC systems. (Ex. J, November 12, 2020 Letter from Russell Hill to Cardinal Square.)[15] This occurred after HVAC Investigations (HVACi), an expert firm hired by QBE, inspected the property in November 2020. HVACi's report found 65 of 65 systems inoperable (HVACi counted each condensing unit as a system) due to a "high voltage surge" and recommended replacing the control boards. (Ex. K, HVACi Report, at 2.)[16] In a section titled "Cause of Loss," the HVACi Report

---

[12] A true and correct copy of this email chain is attached as Exhibit G.

[13] A true and correct copy of this incident report is attached as Exhibit I.

[14] For clarification, many of the 65 rooftop units are often paired with another, forming a total of 36 systems. *Compare* Ex. K (listing 65 systems) *with* Ex. D at Ex-at 60 (listing 36 systems).

[15] A true and correct copy of this letter is attached as Exhibit J.

[16] A true and correct copy of this report is attached as Exhibit K.

states, "[b]ased on the information collected during our onsite investigation, it is the opinion of HVAC Investigators that **the primary cause of loss to the HVAC systems is High Voltage Surge.**" (*Id.* at 3 (emphasis in original).) The report goes on to list 65 HVAC systems with "High Voltage Surge" indicated in the "Damage Type" column for every single entry. (*Id.* at 3–7.)

23. Based on HVACi's analysis, QBE conceded that lightning caused the damage and outlined the payment amount in a November 12, 2020 letter from Russell Hill to Cardinal Square. (Ex. J). QBE did not reserve any of its rights at the time, and issued a check for $12,865.76 (the amount to replace 32 control boards and 32 communicating boards, minus the $10,000 policy deductible). (*Id.*; Ex. K, HVACi Report, at 18.) QBE's adjustor, Russell Hill, noted that lightning is a covered peril, writing in the claim file that the scope of the damage, "[l]ightning electrical storm," caused "[d]amages covered under the policy." (Ex. L, QBE Claim Notes at 45-47).[17]

24. Shortly after the lightning loss, Cardinal Square retained Richard Rambacher and John Diggle, registered Professional Engineers with Rimkus Consulting Group. with over 60 years' combined experience, to assess the damage and its cause. (Ex. D, Rimkus Decl. at Ex-1, Rimkus Report dated November 17, 2021, at 87-97.)

25. After its on-site investigation in January 2021, Rimkus confirmed that "32 of the 36 HVAC systems were down" and observed a "variety of issues" with the systems, including "communication errors, compressors down, [electronic expansion valves] not operating [and] 202 air handlers observed to be down. . ." (*Id.* at 13.)

26. Rimkus determined that the "HVAC equipment, controls, and other system components were damaged as a result of lightning activity on the night of October 20, 2020." (*Id.* at 2; Ex. D, Rimkus Decl. Ex-2, Rimkus Report dated September 7, 2023, at 2.)

[17] A true and correct copy of the claim notes is attached as Exhibit L.

27. Rimkus noted *physical damage*, including scorch marks and burns to HVAC circuit boards and blown fuses "caused by lightning":

**Photograph 24**
Damaged Circuit board caused by lightning.



**Photograph 25**
Damaged Circuit board caused by lightning.



**Photograph 28**
Damaged Circuit board caused by lightning.



**Photograph 29**
Damaged Circuit board caused by lightning.



(Ex. D, Rimkus Decl., Ex-2, Rimkus Report dated September 7, 2023, at 19, 21.)

28. Rimkus determined that the physical alteration to circuit boards, such as those shown above, were consistent with the "direct result of the lightning strike." (*Id.* at Ex. 1 at 3.)

29. From February 23–25, 2021, LG, the HVAC manufacturer, also inspected Village Promenade's HVAC system. (*Id.* at 60-61.)

30. In its findings, LG noted that "[m]ultiple units have electrical type issues," including 19 out of 36 condenser units that had "some type of communication issue at the time of

visit." (*Id.* at 60.) The report also noted that power distribution controllers "have known communication issues that have likely occurred from *a high voltage scenario*," and "[g]iven the fact that lightning *has been proven to have infiltrated the buildings*, each system's electrical system must be investigated to ensure that all present damage is addressed." (*Id.* at 61 (emphases added); *See also* (Ex. T, Larry Gough Dep. Tr. Vol. II at 72:9-86:18.) LG also noted that the lightning strikes voided the LG warranty for the HVAC systems. (*Id.* at 63)

31. LG's report also included photographs of circuit boards removed from the HVAC systems displaying physical damage consistent with a power surge:




(*Id.* at 64); (Ex. D, Rambacher Decl. at ¶7). Cardinal Square personnel also observed burned electronic componentry in various electronic systems across the building, including HVAC. (Ex. A, Larry Gough Dep. Tr. Vol. I at 125:6-127:12; 149:22-158:1.) Repair contractors also removed components damaged by lightning strikes, including circuit boards, and determined that lightning damage was preset throughout the HVAC systems. (*Id.* at 160:1-166:2.)

32. Rimkus's Rambacher attended the February 2021 inspection with LG. He observed LG personnel reset a downed system: "The system powered up and seemed to operate properly then, within a couple of hours, the system was unable to maintain the temperature in the

apartments. Eventually, the system failed to maintain the temperature in any of the rooms." (*Id.* at Ex. 1 at 14.)

33. In the Rimkus Reports, Rambacher describes a clear delineation between the issues experienced by the HVAC systems attributable to product issues and the far different, more pervasive and severe problems attributable to electronic failures experienced by the system after the lightning strikes. (*See generally*, *Id.* at Ex-1 and Ex-2.) The differing character of these component failures were also observed by Cardinal Square, which noted that the failures prior to the lightning strikes largely pertained to problems with fan coil units as the primary failing component; after the strikes, Village Promenade saw an "exponential increase" in the failure of circuit boards, compressors, control wires, electronic valves, and other components that LG's diagnostic software could not diagnose. (Ex. A, Larry Gough Dep. Tr. Vol. I at 100:2-111:4.)

34. For example, Rimkus noted a dramatic increase in failures of compressors, one of the most expensive and critical elements of an HVAC system:[18]

> The HVAC system installation was completed in August 2014. The first compressor failed in March 2016, A total of 44 have failed since installation. Of the 44, ***only*** six failed prior to the lightning strike. There were five additional compressors that were reported as failed after the lightning strike but have not been replaced due to the on-going replacement project. The remaining 38 were replaced after the lightning strike. In December 2020, a total of 4 compressors were replaced. Then, six additional compressors were replaced in February 2021 followed by five more in March 2021. **Figure 1** below shows an increase in the number of compressors replaced after the lightning strike. The repair invoices are included in **Attachment H**.

[18] In its report, LG notes "[o]ne of the most expensive parts to fix in an air conditioning unit, a damaged compressor, may not be noticeable right away. It can take weeks or months for an air conditioning unit to finally fail and indicate the compressor was damaged." Ex. D, Rambacher Decl., Ex-1, Rimkus Report dated November 17, 2021 (LG Report attachment) at 61.




**Figure 1** - Compressor failures before and after lightning strikes.

(Ex. D, Rimkus Decl. Ex-2, Rimkus Report dated September 7, 2023 at 6.)

35. As shown above, over six (6) years of operation before the lightning strikes, only **six** (6) HVAC compressors failed. After the lightning strikes, **38** compressors failed. (*Id.*) Rimkus attributed the failures to a number of problems stemming from electrical-type faults, which can cause HVAC components to quickly degrade due to "stress on the system during peak demand," which is dramatically exacerbated by electrical and electronic component failures. (*Id.* at 8–9.)

36. Rimkus noted that the number of compressor failures before the lighting strike "were within the range of what would be expected for a new installation," but after October 20, 2020, the compressor failure rate was "unexpectedly high and the loss of these compressors was a direct result of the lightning strike." (*Id.* at 5.) Rimkus determined that "[t]he compressor failures [after the lightning strikes] were not consistent with a system problem, or a manufacturing problem or defect found during any of the inspections prior to the lightning strike." (*Id.*)

37. In sum, after multiple in-person investigations, a review of LG's inspection findings, and a review of the inspection performed by QBE's investigator, Rimkus concluded as follows:

> The failure of the compressors was directly related to the low voltage circuits in the electronic expansion valves (EEVs), room thermostats, monitoring panels, and heat recovery control valves being directly physically damaged or altered by the lightning strike. Over time, the low voltage circuits continued to deteriorate and malfunction and failed to perform properly as a direct result of the lightning strike.

(*Id.*)

**QBE backtracks and issues a reservation of rights letter for the HVAC damages.**

38. Unfortunately, the control board replacements recommended by HVACi did not fix the problems. Boards continued to fail, as did other electrical components and compressors continued. (*Id.* at 4-12, 43-149.)

39. Despite covering the initial board replacements, QBE assigned a new claim representative to the file, issued a reservation of rights, and began re-investigating Cardinal Square's claim. (Ex. E, Paul Castellano February 10, 2021 Email to Adam Jacobs, at QBE Bates Range 000662-64; Ex. M, QBE Reservation of Rights Letter dated February 23, 2021).[19] From February 10, 2021 to March 1, 2022, QBE continued to "investigate" Cardinal Square's claim, repeatedly requesting information before finally issuing a claim decision, as described more fully below. (Ex. N, QBE Coverage Denial dated March 1, 2022.)[20]

40. In addition to the damage sustained by the HVAC units, the security system, fire protection system, electrical usage monitoring system, communications system, magnetic doors,

[19] A true and correct copy of this letter is attached as Exhibit M.

[20] A true and correct copy of this letter is attached as Exhibit N.

parking gate, and televisions sustained damage due to the high voltage surge. (Ex. D, Rambacher Decl., Ex-1, Rimkus Report dated November 17, 2021 at 4).

**QBE ultimately denies Cardinal Square's full claim for HVAC damage.**

41. QBE ultimately denied coverage and refused to replace the HVAC units. QBE claimed that Cardinal Square failed to prove a covered loss and that it did not try to repair the units before it began replacing them. (Ex. N, QBE Coverage Denial dated March 1, 2022 at 9-10.) Despite HVACi's report, and despite receiving the Rimkus and LG reports, QBE claimed that it had "not been provided with any **technical findings, reports, or other proof** to date demonstrating that the damage to the Non-HVAC components (again, which QBE paid $539,475.34 to replace), the damage necessitating the HVAC Repair Costs, or the reported malfunctions to the HVAC system were caused by the October 20, 2020 lightning strike." (*Id.* at 4 (emphasis and parenthetical added).)

42. QBE instead relied on a report from ESi, a third-party it retained to "review" the Rimkus report. (Ex. F, ESi Report, at 3.) ESi did not visit the property or inspect any of the equipment at issue. (*Id.* at 4.) QBE maintained that the ESi Report proved that the Rimkus Report "fails to demonstrate that the damage and malfunctions to the HVAC system were not caused by pre-lightning conditions, defects, or preexisting design, installation, and/or operational problems or issues like those alleged by Cardinal against LG and other defendants in the LG Lawsuit." (Ex. N, QBE Denial Letter dated March 1, 2022 at 6.) The ESi Report though contains no technical analysis. (*See generally*, Ex. F). Nor does it dispute Rimkus's findings on factual or technical grounds. (*See generally, id.*)

43. QBE's denial letter and the ESi Report are silent as to whether the HVAC systems were physically altered by the October 20, 2020 lightning strikes. (*See generally*, Exs. N & F, respectively.)

44. QBE's denial letter characterized the conclusion of the authors of the ESi report as a complete rejection of Rimkus's findings. (Ex. N at 6-7.) But the ESi authors only opined that the Rimkus report did not "support[] a determination to a reasonable degree of engineering certainty that any or all of the malfunctions of VRF HVAC systems at the loss location were **solely** the result of a lightning strike [or **r]ule out** to a reasonable degree of engineering certainty that HVAC system malfunctions that were found afterward existed before the 20 October 2020 lightning strike occurrence." (Ex. F at 4–5, 13). At no point did the ESi report conclude that the HVAC systems were *not* damaged by lightning. (*See generally*, *id.*)

45. In its March 1, 2022 coverage denial letter, QBE also cited the Policy's Fraud condition, stating that it could apply "to the extent [QBE determines] that Cardinal Square [breached the provision quoted above] by not disclosing the existence of the prior claims against LG, the LG Lawsuit, or the preexisting HVAC problems and failures to QBE." (Ex. N at 9.) QBE pled the Fraud condition in its 35th and 36th affirmative defenses and in paragraphs 62 through 65 of its counterclaim for declaratory relief. (ECF No. 19 at 37–38, 51.)

46. QBE maintains what it refers to as a "zero tolerance" policy toward fraud. (Ex. C, Fed. R. Civ. P. 30(b)(6) Representative Shannon Grunst Dep. Tr. at 202:23-201:5). QBE explained this policy means that QBE would not pay a claim when it believes fraud has been committed in connection with that claim. (*Id.* at 202:6-205:4).

47. While QBE has contested Cardinal Square's claim for lightning damage to the HVAC systems (the most expensive of the systems damaged by the lightning strikes) and despite

its "zero tolerance" policy toward fraud, it nevertheless paid **$549,475.34** to Cardinal Square for lightning damage to the fire alarm system, internet and network components, televisions, the security systems, the communications system, and the parking systems. (*See* Ex. N, QBE Denial Letter dated March 1, 2022, at 2–3.)

48. QBE's denial makes no mention as to *how* Cardinal Square allegedly concealed its lawsuit against LG, a matter of public record, other than by failing to disclose it before February 2021. (*Id.* at 9). QBE's March 1, 2022 letter confirms that Cardinal Square indeed disclosed the existence of its lawsuit against LG more than a year before its ultimate March 1, 2022 coverage denial. (*Id.*)

49. Cardinal Square disclosed the LG suit in an early-2021 telephone conversation between Steve Dodge, Cardinal Square's claims advocate, and Russell Hill, QBE's initial claims adjustor assigned to Cardinal Square's claim. (Ex. O, February 4, 2021 Email from S. Dodge to T. Stuby-Hekter at Bates Cardinal Square 085204-205.)[21] In that conversation, Hill also indicated that "[h]e would take [the information about the LG lawsuit] under advisement, but did not think that would affect how [QBE would] approach the claim and/or what has been paid to date. At this time [Hill] does not need any other information on that issue." (*Id.*)

50. Despite QBE's position that Cardinal Square failed to disclose the LG lawsuit until February 2021, it was nevertheless aware of the suit some 73 days earlier! QBE ordered a claims history report from ISO ClaimSearch on **November 24, 2020**. (Ex. P, ISO ClaimSearch Report, at 1.)[22] The report disclosed Cardinal Square's insurance and legal claims arising from the pre-lightning issues experienced by the HVAC systems at Village Promenade. (*See generally id.*)

---

[21] A true and correct copy of this email is attached as Exhibit O.

[22] A true and correct copy of this report is attached as Exhibit P.

Cardinal Square's lawsuit against LG, originally filed in Kentucky, was specifically indicated. (*Id.* at 6, 13-14 ("Tort split KY CD lawsuit re failures of HVAC unit").)

51. The claim notes also reflect a thorough review of the report and determined that Cardinal Square had not committed fraud. (Ex. L at 19–25.) QBE Special Investigator Brenda Reavis wrote in the claim file: "Based on the claim investigation, there is no evidence of attempted insurance fraud and no referral to the Indiana Department of Insurance is needed at this time. The insured submitted a claim for faulty HVAC installation." (*Id.* at 24.) At no time during the procurement process did QBE request information pertaining to any pending claims by Cardinal Square *against* another party. (*See generally* Ex. Q, ACORD Insurance Application.)[23] Rather, QBE's application generally asked for information regarding existing claims that may be filed *against Cardinal Square*; instead, it only asked the applicant to "enter all claims or losses" under a heading marked "LOSS HISTORY:"

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **LOSS HISTORY** | | **Check if none (Attach Loss Summary for Additional Loss Information)** | | | | | |
| ENTER ALL CLAIMS OR LOSSES (REGARDLESS OF FAULT AND WHETHER OR NOT INSURED) OR OCCURRENCES THAT MAY GIVE RISE TO CLAIMS FOR THE LAST _____ YEARS | | | | | TOTAL LOSSES: $ | | |
| DATE OF OCCURRENCE | LINE | TYPE / DESCRIPTION OF OCCURRENCE OR CLAIM | DATE OF CLAIM | AMOUNT PAID | AMOUNT RESERVED | SUBRO-GATION Y / N | CLAIM OPEN Y / N |
| | | | | | | | |

(*Id.* at 4.) Notably, QBE issued the Policy with an effective date of August 1, 2020 (Ex. B at 1), 34 days before receiving the insurance application dated September 3, 2020 (Ex. Q at 4, 8, 12, 15, 17, 18, 23, 25 (the signature block of each section is dated 9/3/2020)).

52. Before issuing the 2020 QBE Policy, QBE hired a third-party surveyor to conduct an underwriting survey of Village Promenade. (Ex. R, 7/14/2020 iAuditExpert.com Underwriting Survey Report, at 1.)[24] The investigator was given full access to the common areas of the property,

[23] A true and correct copy of this insurance application is attached as Exhibit Q.

[24] A true and correct copy of this report is attached as Exhibit R.

and interviewed the property's general manager. (*See generally id.*) The report indicated nothing remarkable about the HVAC systems after investigation. (*Id.* at 5–6.)

53. QBE submitted no documentation and has provided no deposition testimony indicating that if it had known about Cardinal Square's lawsuit against LG, then it would not have insured Village Promenade. In the deposition of QBE's Rule 30(b)(6) Corporate Representative, the deponent, who is not an underwriter and has never worked in QBE's underwriting department, indicated that he never spoke with anyone from QBE's underwriting department in preparing to give his testimony on behalf of QBE. (Ex. C, Shannon Grunst Dep. Tr., at 61:2–66:16.) Nor has QBE identified anyone in its Rule 26(a) (1)(A) disclosures other than Adam Jacobs, who is not an underwriter, having discoverable information to support its defenses. (*See generally*, Ex. S, QBE's Initial Disclosures.)[25] And QBE has never sought to rescind the Policy based on its alleged lack of knowledge of the LG lawsuit. (Ex. C. at 187:9-16 (indicating the Corporate Representative did not know whether QBE had attempted to rescind the policy); *see generally* Ex. N, QBE Denial Letter dated March 1, 2022 (explaining coverage determination and citing Cardinal Square's February 2021 disclosure of the LG suit, but making no mention of rescinding the Policy based on lack of disclosure).)

54. The Policy has no provision requiring the insured to disclose any existing lawsuits where the insured was the plaintiff at the time of a claim. (*See generally* Ex. B, QBE Policy.)

55. Larry Gough, who completed the application on behalf of Cardinal Square in September 2020, testified that he understood this form as requesting a list of claims or potential claims *against* Cardinal Square (Ex. T, Larry Gough Dep. Tr. Vol. II, at 128:7–129:22.)[26]

---

[25] A true and correct copy of QBE's Initial Disclosures is attached as Exhibit S.

[26] The Deposition of Larry Gough, Vol II and select exhibits thereto are attached as Exhibit T.

## SUMMARY JUDGMENT STANDARD

When sitting in diversity jurisdiction, under the *Erie* Doctrine, federal courts apply state substantive law but federal procedural law. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 428 (1996). Federal law therefore governs the summary judgment standard and the Policy should be interpreted in light of Indiana law. *Curtsinger v. State Farm Mut. Auto. Ins. Co.*, 120 F. Supp. 3d 857, 858–59 (S.D. Ind. 2015). Summary judgment is proper when the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In determining whether a genuine dispute of material fact exists, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008).

## INDIANA LAW

A federal court sitting in diversity applies the substantive law of the forum state. *Ryerson v. Federal Ins. Co.*, 676 F.3d 610, 611 (7th Cir. 2012). Indiana law therefore applies.

### I. The Parties' Respective Burdens of Proof.

In an insurance policy dispute, the insured has the burden of proving that the coverage applies; the insurer, if relying on an exclusion to deny coverage, has the burden of showing that the exclusion applies. *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 150 (7th Cir. 1994). As it relates to a policy condition, the insured need only show substantial compliance on its part with the condition in order to recover under the policy. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am*., 849 F.3d 355, 365 (7th Cir. 2017).

## II. Insurance Policy Rules of Interpretation and Construction.

"Generally, the interpretation of an insurance policy presents a question of law and is thus appropriate for summary judgment." *Morris v. Econ. Fire & Cas. Co.*, 848 N.E.2d 663, 665–66 (Ind. 2006). Under Indiana law, insurance contracts are generally subject to the same rules of interpretation as are other contracts. *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985). The policy language should be given its plain and ordinary meaning if the language is clear and unambiguous. *Id*. Questions of ambiguity in an insurance policy are resolved in favor of the insured. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992); s*ee also Awbrey v. United States*, 959 F. Supp. 1019, 1022 (S.D. Ind. 1997).

# ARGUMENT

## I. Lightning is a Covered Loss under the Policy and the HVAC systems are Covered Property.

The Policy is an "all risks" insurance policy, and the Policy provides coverage for lightning damage because it is not excluded. The HVAC systems qualify as Covered Property under the coverage provision for machinery, equipment, and fixtures. QBE has not disputed that lightning is a covered peril, nor that HVAC systems are Covered Property. QBE's initial adjustor indicated in the claim notes that lightning is a covered peril and the HVAC systems are Covered Property. (SMF ¶23). These baseline undisputed facts are the central reason why summary judgment is warranted on liability- coverage was undeniably triggered and QBE did not pay consistent with its contractual obligations.

Because the Policy is an "all risks" policy, unless there are specific exclusions listed within the Policy, coverage is afforded to the insured in the event of a loss. *See Hartford Cas. Ins. Co. v. Evansville Vanderburgh Pub. Libr.,* 860 N.E.2d 636, 640 (Ind. Ct. App. 2007) (identifying policy with similar language as "all risks" policy); 10A Couch on Ins., Nature & Scope of Coverage, §

148:50 ("an 'all-risk' policy creates coverage of a type not ordinarily present under other types of insurance, and recovery is allowed for fortuitous losses unless the loss is excluded by a specific policy provision. . . ."). Losses attributable to lightning are not excluded under the Policy. (*See* Ex. B at 103–12 ("Causes of Loss—Special Form").)

For its part, QBE has never contended that lightning is *not* a covered cause of loss under the Policy. Nor has QBE claimed that the HVAC systems are otherwise excluded from coverage under Building and Personal Property Coverage form of the Policy. (*See generally* Ex. N, QBE Denial Letter dated March 1, 2022; ECF No. 19 (QBE's Answer, Affirmative Defenses, and Counterclaim).) As a result, Cardinal Square requests the Court grant partial summary judgment that the Policy contains coverage for lightning damage to the HVAC systems at Village Promenade, as alleged in Count I of the Complaint.

**II. There is no Genuine Dispute of Material Fact that the October 20, 2020 lightning Loss Caused Direct Physical Damage to the HVAC systems at Village Promenade.**

The Policy provides business income loss and property damage coverage in the event of "direct physical loss" to covered property caused by a covered peril. Under Indiana law, "direct physical loss" means physical alteration to covered property. There is no genuine issue of material fact that lightning struck Village Promenade on October 20, 2020, or that the lightning strikes physically altered elements of the HVAC systems at Village Promenade. Indeed, the following facts are undisputed: (a) weather reports indicated two very powerful direct lightning strikes at the property; (b) photographs of the damaged HVAC equipment show scorched circuit boards; (c) photographs of the damaged HVAC equipment show the presence of blown fuses on the HVAC systems; (d) compressor failures increased from 6 in the six-year period prior to the lightning strikes (or one per year) to 38 afterward; and (e) there were dramatically increased maintenance costs required to keep the systems operational following the strikes (SMF ). Thus, Cardinal Square

seeks partial summary judgment on the question of whether lightning caused direct physical loss to the HVAC systems, thereby triggering QBE's coverage obligations.

### A. "Loss" under Indiana law means Physical Alteration to Covered Property, which includes HVAC systems.

The meaning of "direct physical loss" has recently received a great deal of scrutiny as courts grapple with the applicability of these terms to the effects of the COVID-19 pandemic. Indiana and Seventh Circuit Courts each determined that the term means *physical alteration* to covered property, a condition not satisfied by the adherence of viral particles to the surface of covered property or by mere loss of use of a property as a result of the pandemic response. *Indiana Repertory Theatre v. Cincinnati Cas. Co.*, 180 N.E.3d 403, 407–08 (Ind. Ct. App.), *transfer denied sub nom.*, 193 N.E.3d 372 (Ind. 2022); *Circle Block Partners, LLC v. Fireman's Fund Ins.* Co., 44 F.4th 1014, 1018, 1022–23 (7th Cir. 2022).

In its determination that the presence of COVID-19 virus particles on the premises of the insured, a commercial property owner, did not constitute a "loss," the Indiana Court of Appeals discussed the definition of loss and concluded that a loss means "damage or alteration" to covered property. *Indiana Repertory Theatre*, 180 N.E.3d at 410. But such damage or alteration must only be physical in nature to trigger coverage: "The policy here clearly requires direct 'physical loss' or 'physical damage' to trigger business interruption and extra expense coverage. Accordingly, there must be some physicality to the loss or damage of property—e.g., a physical alteration, physical contamination, or physical destruction." *Id.* at 410 (quoting *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021)). The court reconciled this definition with the "period of restoration" provision[27] of the policy, which specified that "coverage begins and ends based on

[27] The QBE Policy similarly has a "Period of Restoration" provision in its "Business Income (and Extra Expense) Coverage" (Ex. B at 84, 92) and "Causes of Loss—Special" forms. (*Id.* at 107).

when the covered premises is 'repaired, rebuilt or replaced' or the 'business is resumed at a new permanent location.'" *Id.* The court held that, "[w]ithout *physical alteration or impact* to [the insured theatre's] premises, there can be no period of restoration. . . ." *Id.* (emphasis added). In holding that there can be no loss without physical alteration, the Indiana Court of Appeals necessarily endorsed the corollary: that a loss occurs when there is physical alteration to a covered property. *See id.*

In construing nearly identical policy language covering "direct physical loss or damage,' the Seventh Circuit, applying Indiana law, noted "the term 'damage' connotes some kind of harm." *Circle Block Partners*, 44 F.4th 1014 at 1022. Like the Indiana Court of Appeals in its 'period of restoration' analysis, the Seventh Circuit endorsed the reasoning that physical damage would encompass alteration "such that [covered property] would have to be repaired, rebuilt, or replaced." *Id*. at 1023. Consistent with this reasoning, the Seventh Circuit held that "direct physical loss" requires "some physical alteration" to the covered property. *Id.* at 1021. Thus, in Indiana, a "physical loss" occurs when property is *physically altered* by a covered event. Taken together with the fact that lightning is a non-excluded peril, and therefore covered, Cardinal Square need only show physical alteration of the property as a result of lightning to prove a covered loss.

Furthermore, degraded performance in equipment has been treated as a loss when caused by a covered peril. *T.R. Bulger, Inc. v. Indiana Ins. Co.*, 901 N.E.2d 1110, 1112 (Ind. Ct. App. 2009) (HVAC was functional but damage caused by covered peril, faulty workmanship, caused leaks and produced noises so loud as to violate local noise ordinance); *Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 746-47 (7th Cir. 2015) (holding "direct physical loss" encompassed both cosmetic and functional damage by a hailstorm to a damaged, but not destroyed roofing system); *Homeowners Choice Prop. & Cas. v. Miguel Maspons*, 211 So. 3d 1067, 1069 (Fla. Dist. Ct. App.

2017) (explaining that degraded performance constitutes a Loss: "'Direct' and 'physical' modify loss and impose the requirement that the damage be actual. Examining the plain language of the insurance policy in this case, it is clear that the failure of the drain pipe to perform its function constituted a 'direct' and 'physical' loss to the property within the meaning of the policy.")

Here, elements of the HVAC systems were physically altered by the October 20, 2020 lightning strikes. Scorch marks and burns are clearly visible on circuit boards that were installed in the HVAC systems at the time of the strikes. (SMF ¶¶27-31.) The Rimkus Reports also note blown fuses, which occurs when "a thin piece of foil or wire quickly vaporizes when an overload of [electrical] current runs through it." (SMF ¶27.)[28] As explained in the Rimkus and LG reports, electrical overcurrent caused by lightning damages and destroys electronic components, including those in an HVAC system, which causes communication faults and errors that, in turn, cause stress upon the mechanical components when all elements of the HVAC systems are unable to function as intended, causing additional component failures over time. (SMF ¶¶35-37.) These failures are directly attributable to the damage caused by the October 20, 2020 lightning strikes (SMF ¶37.)

QBE has submitted no evidence supporting its position that the HVAC systems were *not* physically altered by lightning. Rather, QBE's investigative efforts consist of reports by HVACi (which indicates surge damage to 65/65 systems) and ESi. The HVACi Report establishes that a covered loss occurred (SMF ¶¶22-23). Meanwhile, the ESi Report never states that the HVAC systems were *not* damaged by lightning, but rather claims that the Rimkus report did not prove "to a degree of engineering certainty" the negative proposition that the HVAC malfunctions did not predate the lightning strikes. (Ex. E at 6.)

[28] Brain and Roos, "How Power Grids Work," HOW STUFF WORKS. (available at https://science.howstuffworks.com/environmental/energy/power8.htm#:~:text=In%20a%20fuse%2C%20a%20thin,few%20homes%20still%20use%20them) (last visited Dec. 23, 2023).

The ESi Report does not create a genuine dispute of fact in this context because it does not conclude that the HVAC systems were *not* damaged by lightning. The ESi Report is only a review and criticism of the Rimkus Report and is not an independent investigation; it makes no affirmative findings of fact. The ESi Report does not offer an opinion on the most probable cause of the ongoing problems with the HVAC systems. It makes no determination that the ongoing HVAC problems are solely the result of the product defects pleaded in Cardinal Square's lawsuit against LG or that lightning did not alter them or create new, different and more serious problems. Nor does the ESi report address any photographs taken of circuit boards with scorch marks and other physical damage consistent with electrical damage or offer an alternative explanation as to how such damage occurred if not for the lightning strikes. Most importantly, the ESi report makes no determination that the HVAC systems were *not* physically altered or damaged by the lightning strikes. (*See generally, id.*)

ESi's findings also come with numerous provisos and qualifications, stating that the Rimkus Report does not prove to a reasonable degree of engineering certainty[29] that "the malfunctions of VRF HVAC systems at the loss location were *solely* the result of a lightning strike." (*Id.* at 4.) But damage to covered property need not be *solely* attribute to a covered loss to comprise "direct physical loss." Nor does pre-existing damage to property invalidate insurance coverage. By way of analogy, if an insured driving a malfunctioning Ford Pinto that was subject to a product defect lawsuit against the manufacturer was totaled in a collision, QBE could not deny

[29] The policy itself is silent as to the requisite burden of proof on the part of the insured. (*See generally* Ex. B.) The standard of proof for insurance claims is typically, like most civil actions in contract, preponderance of the evidence. *See* 17A Couch on Ins., Generally, § 254:8; 17A Couch on Ins., Degree of Proof, § 254:14 ("While the degree of proof required for both coverage and exclusions is generally described as being a preponderance of the evidence, there may be a slightly heavier weight required for proof of exclusions.").

coverage just because there were issues with the Pinto that predated, and were not solely attributable, to the collision. In this analogy, QBE could deny coverage only if the Pinto were not damaged by the collision.

Here, both Cardinal Square and ESi have acknowledged that Village Promenade was struck by lightning (SMF ¶18),[30] but QBE maintains, without evidence, that the strikes did not damage the HVAC systems, even though it paid $549,475.34 for the replacement of virtually every other electrical component on the property also damaged by the lightning strikes! (SMF ¶47.) QBE's speculation does not create a genuine issue of material fact, especially in light of the strength of the lightning strikes, the evidence of direct physical damage to the systems (i.e., the burns and scorch marks observed on circuit boards and blown fuses pulled from the HVAC systems), the increased cost of keeping the HVAC systems online, and the electrical malfunctions consistent with power surge damage (SMF ¶¶25-37).

Accordingly, there is no genuine dispute of material fact that the October 20, 2020 lightning strikes physically altered the HVAC systems at Village Promenade, thereby triggering coverage under the QBE policy.[31] Cardinal Square requests the Court grant partial summary judgment on Count I and find that lightning damaged the HVAC systems, triggering a Loss under the Policy.

## III. There Is No Genuine Dispute of Material Fact that Cardinal Square Did Not Conceal or Misrepresent its Lawsuit against LG, either when It Procured the QBE Policy or when It Filed its Lightning Claim.

QBE has pled the Fraud condition as affirmative defenses, arguing that Cardinal Square should have disclosed its lawsuit against LG at some time before it did disclose the suit in early

[30] QBE appears to acknowledge that Village Promenade was struck by lightning at some portions of its Answer, but offered an explicit general denial of Cardinal Square's pleadings. (ECF No. 19 at 11, 33.)

[31] For the sake of clarity, Cardinal Square moves only for a finding of a "Loss" under the terms of the policy and does not request findings of fact related to the extent of lightning damage to the HVAC systems or any amount of damages.

2021. However, QBE was not prejudiced by the timing of this disclosure, which was made more than a year prior to QBE's claim determination. Nor did Cardinal Square conceal the lawsuit, which is a matter of public record. Furthermore, Cardinal Square had no duty to disclose the lawsuit at the time it applied for insurance because QBE did not request information on lawsuits filed *by* Cardinal Square or for lawsuits in which there was no possibility Cardinal Square would incur liability. Either way, any omission was immaterial because (a) QBE had already agreed to insure Cardinal Square before receiving its insurance application; (b) QBE has not attempted to rescind the policy after learning of the LG lawsuit; and (c) QBE has provided no evidence that it would not have insured the property had it been aware of the LG lawsuit. As a result, Cardinal Square requests that the Court grant summary judgment against QBE on its 35th and 36th affirmative defenses and paragraphs 62 through 65 of its counterclaim.

It is undisputed that Cardinal Square did not misrepresent or conceal the LG lawsuit with respect to its claim. In fact, it disclosed the lawsuit, a matter of public record, more than a year prior to QBE's coverage determination. And either way, any omission cannot possibly be considered to be material. A material misrepresentation or omission of fact in an application for insurance may render coverage *voidable* at the insurer's option, but only if the insurer relied on it. Here, QBE has never attempted to void the policy, nor would any such effort be justifiable given that Cardinal Square has never misrepresented or concealed its product defect lawsuit against LG. Moreover, Cardinal Square cannot be said to have concealed information from QBE because QBE did not request information about outstanding legal claims *by* Cardinal Square. And even if Cardinal Square's omission of the LG lawsuit could constitute concealment, QBE as not sought

rescission of the Policy.[32] Furthermore, QBE began insuring Village Promenade prior to receiving Cardinal Square's application. Most importantly, QBE has failed to provide any evidence that it would not have underwritten the Policy had it known about Cardinal Square's suit against LG.

To sustain its defense based on the policy's Fraud condition, QBE must prove that a statement by Cardinal Square was (1) false, (2) material, (3) willful, and (4) intended to deceive or to defraud it. *See Tenore v. American & Foreign Ins. Co. of New York*, 256 F.2d 791, 794–795 (7th Cir.1958). This is a heavy burden. The conduct complained of must be designed to cheat and to deceive. Misunderstandings that arise from the good faith judgment of the insured cannot sustain fraud, concealment, or misrepresentation defense; Indiana law requires intentional conduct. *See Selective Ins. Co. of Am. v. Smiley Body Shop, Inc.*, 260 F. Supp. 3d 1023, 1040 (S.D. Ind. 2017); *Am. Econ. Ins. Co. v. Liggett*, 426 N.E.2d 136, 138 (Ind. Ct. App. 1981); *Trzcinski v. Am. Cas. Co.*, 953 F.2d 307, 313 (7th Cir. 1992).

### A. Cardinal Square's Immaterial Delay in Informing QBE about the LG Lawsuit was Neither False nor Willful.

It is undisputed that Cardinal Square disclosed the LG lawsuit to QBE during the claim process and more than a year prior to QBE's coverage determination. QBE was notified of the LG lawsuit before it made a coverage determination denying part of Cardinal Square's claim;

[32] The Policy contains no contractual remedy for fraud in the procurement of insurance outside of rescission, which is a default, common law remedy. As indicated by the Policy language, the Fraud condition has been modified by the Indiana Changes endorsement, which only applies to "[c]oncealment or misrepresentation of a material fact or [f]raud committed by an insured at any time **and relating to a claim** under this policy." (Ex. B at 27 (emphasis added).) The phrase "and relating to a claim" limits the applicability of the exclusion to concealment or misrepresentation when the insured files a claim. The language necessarily eliminates concealment or misrepresentation in the procurement of a policy, leaving QBE only with an option to rescind a policy and refund the insured's premium in such circumstances. *See* 16 Ind. Law Encyc. Insurance § 97 ("An insured may rescind the contract of insurance for fraud or mistake provided they act within a reasonable time, restore anything of value received under the policy, and are not estopped, and after the contract is rescinded, there can be no recovery for a subsequent loss. The insured cannot rescind an insurance contract without restoring or offering to restore what they received.").

therefore, there is no concealment, fraud, or misrepresentation that could have prejudiced QBE's coverage determination to partially deny Cardinal Square's lightning claim. QBE has referenced the fact that Cardinal Square did not notify QBE of the LG lawsuit when it initially notified QBE of the lightning loss. Yet QBE has never identified any part of the Policy requiring Cardinal Square to do so, and Indiana law does not allow insurers to impose undisclosed or secret obligations on insureds, a practice that would violate Indiana's public policy requiring policy ambiguity be resolved in favor of insureds. *See Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 948 (Ind. 1996).

Cardinal Square's disclosure of the LG lawsuit in February 2021 also was not false. Cardinal Square has made no false representation that the LG lawsuit was *not* ongoing, and the summary judgment record contains no affirmative misrepresentations of that fact by Cardinal Square. QBE's insurance application makes no request for all active lawsuits; instead, it only asked the applicant to "enter all claims or losses" under a heading marked "LOSS HISTORY." (SMF ¶51.)

Larry Gough, who completed the application on behalf of Cardinal Square in September 2020, testified that he understood this form as requesting a list of claims or potential claims *against* Cardinal Square (SMF ¶55), a natural assumption when applying for a commercial lines policy that included general liability coverage.

Moreover, even if QBE were asking for all claims *by and against* Cardinal Square, Gough's omission of Cardinal Square's claim against LG was not intentional. To say that Gough was intentionally concealing HVAC problems in the off-chance they would be struck by lightning thereby enhancing the odds of a favorable insurance coverage determination, is both preposterous and undermined by Cardinal Square's eventual and unprompted disclosure of the suit three (3) months after the strikes.

Given that it would be unusual to interpret a request to "enter all claims or losses . . . or occurrences that may give rise to claims" to include outstanding claims *against* other parties, the fact that the Cardinal Square's signatory understood the request to mean claims and potential claims against Cardinal Square, and the fact that Cardinal Square has never affirmatively represented that it was not engaged in litigation, Cardinal Square's omission of the lawsuit from the insurance application was neither false nor willful.

**B. Even if there is a Genuine Dispute of Fact as to Whether Cardinal Square Willfully and Falsely Omitted the LG suit from its Insurance Application, the Omission was not Material.**

The Indiana Supreme Court has laid out two tests for materiality in a misrepresentation, concealment, and fraud insurance policy condition:

> Under one definition, a misrepresentation or omission is 'material' if knowledge of the truth would have caused the insurer to refuse the risk or to charge a higher premium for accepting the risk. . . A second approach to materiality in a case. . . where rescission is attempted after a loss has been incurred, would measure the materiality not against the underwriting decision, but rather against the loss. In other words, coverage of the incurred loss would be voided if the misrepresentation affected that risk, but not all coverage would necessarily be voided.

*Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 672–73 (Ind. 1997). The Indiana Court of Appeals interpreted these tests in the context of alleged fraud in a claim investigation process in *InsureMax Insurance Company v. Bice*, 879 N.E.2d 1187, 1191 (Ind. Ct. App. 2008). There, it found that both tests "focus on whether the misrepresentation had a significant impact on the insurer's decision-making process." *Id*. Applying that inquiry, *InsureMax* declined to void an insurance policy on summary judgment, since the insurer had not presented evidence that the insured's misrepresentations caused the insurer to take a substantially different position in responding to its potential liability. *Id.* at 1191–92.

The Northern District of Indiana, applying the *InsureMax* test, has even held that an insured's admitted lie did not trigger a misrepresentation, concealment, and fraud condition because the lie was ultimately immaterial to the risk insured against. *See Acuity v. Auto Tech Automotive Inc.*, No. 2:09–CV–336, 2012 WL 124928 at *6 (N.D. Ind. Jan. 17, 2012). In that case, a fire destroyed a number of tools belonging to the insured's employees. *Id.* at 1. The insured lied and said his own tools were also destroyed in the fire because he did not want to tell his employees their tools, and not his, had been destroyed in the fire. *Id.* at *2. However, the insured's tools were not covered property and the insured never received any compensation from the insurer for them before or after his lie was exposed. *Id.* at *6. Nevertheless, the insurer sought to void its responsibility to indemnify the insured for the employees' claims for their destroyed tools (which was covered) based on the insured's lie. *Id.* at *3. The Northern District of Indiana denied the insurer's summary judgment motion under a fraud, concealment, and misrepresentation condition, concluding that the insurer failed to demonstrate that the lie was material to the indemnity coverage it owed, which would not have been affected whether or not the insured's tools were destroyed:

> Because Acuity had no duty to compensate for the loss of the truck, trailer, and tool box, it is difficult to see how [the insured's] misrepresentations with regard to them were material. Acuity has presented no evidence providing clarity on this problem. Even if the truck, trailer, and tool box were covered under the policy, this case, like *InsureMax*, lacks evidence from the insurer regarding the effects that the misrepresentations had on decisions to investigate and/or defend against the claim. Acuity has submitted an affidavit from [its] Senior Claim Representative, who attested that he considered the presence or absence of property at the fire scene relevant to the question of whether the insured intentionally set the fire. But this statement only approaches the issue of materiality theoretically. Bonnett does not attest to how Acuity's decision to proceed with investigating and defending against claims was significantly impacted by [the insured's false] statement. . . . In short, Acuity has not presented sufficiently convincing evidence that its decision-making process would have been significantly different if [the insured] had never said a word about the whereabouts of the truck, trailer, and tool box.

*Id.* at *6–7. The Northern District of Indiana later adopted this approach in another case involving alleged fraud by the insured in the claim process. *Acuity v. Auto Tech Auto. Inc.*, No. 2:09 CV 336, 2012 WL 124928 (N.D. Ind. Jan. 17, 2012). There, the insured lied to the insurer (before later recanting) about items that were destroyed in a structural fire. The insurer argued on summary judgment that the insured's misrepresentations voided the policy under a fraud condition. The district court denied summary judgment finding, among other things, that "this case, like *InsureMax*, lacks evidence from the insurer regarding the effects that the misrepresentations had on decisions to investigate and/or defend against the claim." *Id.* at *7.

As in *Acuity*, the first prong of the *InsureMax* test is not satisfied because QBE has not put forth any evidence demonstrating that knowledge of the LG suit would have affected QBE's underwriting of the Policy. (SMF ¶53.) QBE has presented no evidence that it would have "refused the risk" or demanded a higher premium had it known about the LG suit. Nor has QBE provided any testimony or written policies or procedures indicating that claims by insureds against third parties should preclude coverage or require a larger premium. In fact, the evidence shows QBE is willing to insure properties *before* receiving completed insurance applications based on the fact that coverage for Village Promenade began before QBE received Cardinal Square's insurance application. (SMF ¶51.)

The second *InsureMax* prong is also not satisfied. Knowledge of the LG suit did not lead QBE to attempt to rescind the policy. Following QBE's notice of the LG suit, which either happened in November 2020 when it received the ClaimSearch Report, or in February 2021 when Cardinal Square informed it of the suit, QBE did not attempt rescission either before or after its ultimate coverage denial in March 2022. (SMF ¶53.)

Finally, there is no genuine dispute of material fact as to whether Cardinal Square committed fraud by disclosing the LG suit in February 2021 *based on QBE's own findings.* As indicated in the claim notes, QBE undertook an investigation to determine whether Cardinal Square's lightning claim was fraudulent. QBE's investigator determined that "*there is no evidence of attempted insurance fraud*" and distinguished the prior claim against LG and the claim against an LG-licensed subcontractor from Cardinal Square's claim for lightning damage (SMF ¶51). Additionally, QBE's "Zero Tolerance" policy regarding fraud claims would have led it to deny Cardinal Square's claim in its entirety if it believed Cardinal Square had engaged in fraud. Instead, QBE paid $539,475.34 to Cardinal Square to cover other lightning-damaged electronic equipment. (SMF ¶¶46-47).

In sum, there is no genuine dispute of material fact that Cardinal Square did not misrepresent or conceal the LG suit. Cardinal Square therefore requests the Court enter summary judgment on QBE's its 35th and 36th affirmative defenses and paragraphs 62 through 65 of its counterclaim.

## CONCLUSION

Two massive lightning strikes directly hit Village Promenade. They caused the HVAC system to immediately stop working, to be unsalvageable, and voided the warranty. They also caused Cardinal Square to incur replacement costs and suffer business income losses. Guarding against a loss like this is the very reason why Cardinal Square paid a premium for to buy a replacement cost policy from QBE. Based on the undisputed facts, QBE owes Cardinal Square coverage under the Policy. The only real dispute is the scope and extent of the losses, something which Cardinal Square has not put at issue with its Motion for Partial Summary Judgment.

Respectfully submitted this the 5th day of January, 2024.

*/s/ Jason R. Delk*
Attorney for Plaintiff Cardinal Square, LLC

**OF COUNSEL:**
Jason R. Delk (#24853-18)
DELK MCNALLY, LLP
211 S. Walnut Street
Muncie, Indiana 47305
delk@delkmcnally.com

Sean W. Shirley (admitted *pro hac vice*)
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, Alabama 35203
sshirley@balch.com

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Bradford S. Moyer (#25964-49)
PLUNKETT COONEY, P.C.
201 North Illinois Street
South Tower, 16th Floor
Indianapolis, Indiana 46204
(317) 964-2738 Phone
(248) 901-4040 Fax

Kenneth C. Newa (#30474-49)
PLUNKETT COONEY, P.C.
38505 Woodward Avenue, Suite 100
Bloomfield Hills, Michigan 48304
(248) 901-4000 Phone
(248) 901-4040 Fax

*Counsel for Defendant QBE Specialty Insurance Company*

*/s/ Jason R. Delk*
Of Counsel